Good morning and may it please the court. My name is Palmer Huvestal. I'm an attorney from Helena, Montana. I'm appearing on behalf of the appellant Matthew Dowd. And I think initially what I'd like to point out to the court is that Mr. Dowd is currently incarcerated in a federal prison where he's been for the last almost 10 years. In February of 2013, he will have done his 10-year sentence, 10 years of a 144-month sentence. After he discharges that sentence, he will be called upon to serve another consecutive 10-year sentence for a crime that he factually did not commit. He was convicted of that crime, however, because his trial counsel failed to interview, seek out, locate, interview, and call to testify five witnesses who would have provided exculpatory testimony that directly contradicted and refuted and contravened the testimony of the alleged victim. Right ahead. No, you first. Okay. Well, can you just help me from the standpoint of the record? Let's put aside Wiley, I guess, that one witness, Wiley, and focus on, I can't remember the names, but it's the friend, the girlfriend, and the sister, I think. The first, these all relate to interstate travel from between Montana and Utah. Utah. Okay. The first one is Miguel Velasquez. That's who I'm thinking of. Okay. As to those three, that group of three witnesses from Utah, am I right in understanding the record to show that the district court, after hearing live testimony, I guess, from your client and from the defense lawyer, concluded that, and this is what I'm trying to get straight, did the district court conclude that your client hadn't given the defense lawyer enough information to find those folks? In essence, that's correct. And we dispute that, of course. And the basis for the dispute is the attorney's own handwritten notes. If we go back and look through the record, I provided them. I've tabbed them so that I can point them out to the court. In defense counsel's own handwritten notes, there are references to this individual, Miguel. Granted, we don't have his last name. Miguel in the Utah, in the state of Utah. Yes. Right. How many Miguels are there in the state of Utah? I don't know. A lot. A lot. I would assume. But defense counsel also had the means by which he could locate those witnesses, Miguel in particular. First, he was told that Miguel's telephone number is in my possessions at the Superior County Jail, or Mineral County Jail in Superior, Montana. He did not go and look through those possessions, nor did his investigator to attempt to obtain that telephone number. Secondly, he was told, my brother has a telephone number. Whether that actually, whether they went and got that telephone number, the record is unclear. But he was told that Keith, my brother, Keith Dowd, can provide that number to you. Third, he was told that Keith could take him to where Miguel lives and introduce him. And, in fact, the record does reflect that's what happened ultimately in our situation. Bought a ticket, went down to Salt Lake City, rented a car, went up to their house, knocked on the door, and here we are. So the point is, there were three witnesses, the Utah witnesses, that were available, that defense counsel and the investigator, defense investigator, knew how they could obtain information to locate these witnesses. Okay, so next question then. Let's assume that we agree with you that the district court erred in finding that there wasn't enough information provided so that the witnesses could be located. Did the district court also find that your client just simply hadn't told the defense lawyer how much exculpatory testimony these witnesses could provide, such that when the lawyer was trying to order priorities, rushing to get ready for trial, he understandably just said, you know what? These folks don't sound like they're going to be able to help that much because we've got these other witnesses who can cover the same ground. Was that also part of the district court's finding here? Yes, it was. And, of course, we contend that the district court erred. And I can point the court out to the record where the district court basically refuted or didn't give enough weight to defense counsel's testimony. That's in tab 8, which is defense counsel's testimony. It begins at line 48. And he's talking about this Miguel fellow. And the question was posed, and did Miguel— What page of the transcript is that? It's on page 48, Your Honor. And I'm beginning at line 16. And, well, actually at line 12. All right. What did Miguel, what specific information did Mr. Velazquez have to tell you? Well, or did you know? Answer. Matthew had mentioned a Miguel. Mark Fullerton, the investigator, well, here's what Matthew had told us as I understand it, as I remember it. Matthew said that his brother, Keith Dowd, had a telephone number of Miguel. And Miguel had information as to the relationship of Matthew Dowd with Dana Johnson and perhaps could give some testimony as to the fact that Dana was not in any way kidnapped or in any way being forced to do anything against her will. Question. Okay. Answer. That was the relevance of this individual named Miguel. So as far as defense counsel could remember, when he testified seven years after the event, he said Miguel could provide information that Dana was not in any way being forced to do anything against her will. That's why we contend that the district court erred when he found that Mr. Dowd hadn't provided defense counsel with adequate information. What do we do with the district court's adverse credibility finding? I mean, you're giving us Mr. Dowd's version of what he said, but the district court heard all of that and found him to be unbelievable and credited the testimony of his former defense counsel and investigator as to what little information they had obtained from Mr. Dowd on locating those individuals. Well, of course, there is substantial deference on review to  That's correct. But I would point out that this testimony from defense counsel, this is defense counsel's testimony. That's right. You were reading the part you just quoted to us as the defense lawyer saying what Mr. Dowd had told him. He acknowledged that Mr. Dowd told me, defense counsel, that Miguel had exculpatory evidence that went to the heart of the elements that the government had to prove on a reasonable doubt at trial. Okay. But, I mean, I grant you that the portion of the transcript you quoted does sound like Miguel would be able to provide exculpatory evidence, but I think the force that you gained in your brief from going through what, is it Mr. Velasquez? Yes. Would have testified to now is that they, you know, he was there and had so much interaction with the two that he would have been maybe in a better position than some of these third-party witnesses to testify that she hadn't suffered the abuse that she claimed she had. But I didn't hear anything in the quote you just read to us that suggested that Mr. Dowd had provided information just about the, I guess, the extent of the context such that the defense lawyer could say, I'm not going to go with these store, these completely neutral store employees and the like who would seem to be more So I didn't hear enough about what the defense lawyer was told in terms of the level of detail that Mr. Velasquez could provide. Okay. So in terms of credibility, the district court raised credibility in the rules. This court has to find that he clearly erred. And I would point the court out to the exhibits, the communications that were made between the written, handwritten notes. So clearly there was communications between the two and between the defense investigator. The defense investigator at some point, defense counsel stated during his deposition, you know, I don't have a great recollection of what Mr. Dowd told me or what we did, and so I would defer to the defense investigator. And so we obtained the defense investigator's notes. The defense investigator stated, and this is Exhibit 18, rather. It's on page 50 of Excerpt 9. The defense investigator stated this. I'm sorry. Is there Volume 9? I don't understand. It's tab 9. Page 50? Volume 3. Okay. Page 50? Yes. Page 50. It's Exhibit 18. And this is his notes. No record of attempt to identify or contact Miguel. And so they did absolutely nothing in terms of effort to contact or identify this person. And I hear you on that, but just help me with this, because as I understand the district court's findings, he says, look, the defense lawyer, he got this name Miguel. He's told by the client this Miguel might provide some exculpatory information about the fact that Ms. Johnson, I guess it was, the victim, wasn't abused, wasn't kidnapped. But he's already lined up, what, four, five, six other witnesses who are completely independent from your client who are going to say the same thing. So unless the defense lawyer has told something unique about this Miguel in terms of the information he's going to be able to add, isn't it a reasonable investigative strategy to say, you know what, I'm not going to go try to run down a rabbit hole and find these out-of-state witnesses. I've got these other people who are going to give me the same information. So what is it that you're saying the defense lawyer was told about Miguel that's different from what these other witnesses were already going to provide? Again, they're in the notes. The notes specifically say Utah. And I think there's a note that says two weeks. In other words, they were there for two weeks or so. It could provide evidence that she was not under distress or something like that. I can look up, find the note. But that provides the specific substance of what Mr. Dowd told defense counsel. But isn't that what the four or five independent witnesses were being called to offer? But they were not from Utah. Nobody had any idea. Those were all in-state Montana witnesses. Yeah, but I thought the whole point was to show that she was not staying under coercion with him, that she could have left him any time she wanted to, based on the observation of the independent shopkeepers who were not doing drugs with Mr. Dowd or, you know, the other disabling factors that counsel would have to consider. But those were all in-state Montana witnesses. These witnesses were all in Ogden, Utah. And so they spent two weeks, and Dana Johnson, Mrs. Johnson, testified in detail about the alleged abuse that she suffered in Utah. And it just flat didn't happen. And had defense counsel actually gone out and located these witnesses, we can look at the investigator's note to the court in an effort to obtain, I think, $3,500 more investigative fees. He says specifically there are three out-of-state witnesses who I'm going to go interview, and that's what I'm going to do. And so these are them. They just didn't do it. And they can provide factual, specific factual testimony that Mr. Dowd did not do what Dana Johnson contended that he didn't. And so I have two minutes. You want to save some time? 20 seconds, I'll reserve the rest. All right, very good. We'll hear from the government. Good morning. May it please the Court, Tara Elliott on behalf of the government. Your Honors, I'm going to follow up, if I may, with some of your questions. I think I'd like to address those. They seem significant, and I think probably the essence, if we boil this down to why we're all here. And I think one thing I'd also like to point out to this Court that didn't come up when Mr. Hubestall was talking was the district court judge in this case found Mr. Bailey, the counsel, and, of course, Mr. Fullerton to be credible in this case, as we discussed. And one important thing is that he found Mr. Bailey to be credible on the issue of the discussion of the presentation of testimony in this case. And what I think is one of the most telling just examples of how significant that is, is even afterwards, even after trial, in a letter to Mr. Bailey where Mr. Dowd, of course, is complaining about his representation, he also doesn't complain about these witnesses that we discussed in Utah. And I really think that is what we're here about. Just like you said previously, why are we here on this 2255? And that's because of the argument that Mr. Bailey's performance was inefficient. And I think based on that fact almost alone, we can say that perhaps Mr. Dowd is not being credible in these claims, and Mr. Bailey is, and no other attorney may have been able to find these people. I'm not aware of any case law in the ineffective assistance of counsel realm that says there's some requirement that the defendant complain contemporaneously about counsel's performance. What we're looking at is just objectively whether Mr. Bailey's performance fell below the standard that a reasonably confident lawyer would have provided. And I'm hearing enough from defense, from your opponent here, to suggest that Mr. Bailey perhaps was provided with specific information about what the nature of the And yet it sounds like the defense lawyer did nothing here to follow up on that. Well, and I understand exactly, and I concur with you, of course. I think that according to the notes, we have the note that says Miguel, or McGill as Mr. Bailey spells it. But then we also have information from Mr. Fullerton that he actually did go and speak with Keith Dowd to get that number that he was supposed to get. And that Keith Dowd was like, you know, I don't have it, or something to that effect is my understanding. And then the out-of-state witnesses, I think Mr. Huvestal is referencing, and I don't know this for sure, but there were numerous out-of-state witnesses. The three that he's referring to, I believe, were the Colorado witnesses that he spoke to. Possibly. I don't know specifically. But Mr. Huvestal seems to be making a conclusion that those witnesses were these three Utah witnesses. And I don't think that's actually a fair conclusion to draw because there were so many other out-of-state witnesses, specifically the ones in Colorado, that were also an issue in this 2255. Were they interviewed after the district court authorized the expenditure of $3,500 in investigative resources? The Colorado witnesses, Your Honor? Yes. Those were witnesses. One was Bill Wiley, who I think we were unable to, as best Mr. Huvestal and I can tell, he's deceased. So I'm not aware of any Colorado witnesses that were interviewed after the 2255 was ordered. I'm not sure I made my question. Oh, I'm sorry. I apologize, Your Honor. And you probably don't know this because you never see this paperwork, but we do. The defense filed a CJA request for investigative fees that I believe Mr. Huvestal was referring to. And as justification for $3,500 in investigative expenses, apparently the justification was there are three witnesses somewhere, he said Utah, that need to be interviewed. Are you familiar with, I think that was an exhibit at the hearing. Oh, I understand. I'm sorry, Your Honor. I was thinking of originally at the trial of the 2255. Right. No, no, no. I'm talking about at the time of the trial or prior to trial. I can tell you that they were not interviewed. I think that's clear from the record. The court approved the expenditure, but as far as we can tell, Mr. Fullerton didn't go to Utah. I don't believe Mr. Fullerton ever went to Utah, Your Honor. So I guess it is fair to, that's an interesting issue. The court approved the- I didn't see any reference to it in the district court's orders after the 2255 hearing. Yeah, I don't recall that being an issue at the hearing. All right. I don't want to get us off on a tangent. No, no. I'm wondering what your response was. I think the other issue with the Miguel Velazquez and the Utah people, though, and then we could go to a And I think that there is some evidence in the record that Mr. Velazquez was a drug dealer. Now, that by no means weighed into Mr. Bailey's calculus, but can it weigh into the court's calculus now about whether prejudice would have resulted, whether the prejudice prong is met here, meaning, okay, let's say Mr. Bailey had called Mr. Velazquez pursuant to the requests by him not being called as their prejudice. And I don't know. I can't-I don't know that the court-I think that's something the court can calculate in, that Mr. Velazquez may not have been a very good witness. But he had firsthand contact with these two people over a much more extensive time period than any of the witnesses who were called at trial, right? Yeah, if I recall correctly, I believe it was like a Thanksgiving holiday that they spent together in Utah. And I also will say I was at the depositions of these individuals. And I'm not going to represent to the court that I didn't believe that they were-at least the two women were being truthful. But that wasn't really the whole government's case. The government's case was so broad. We don't know, actually, that the jury found Mr. Dowd guilty on the one count because of any interaction in Utah. That's not clear. They didn't have to do that. It was the interstate transportation of domestic violence. But the force of the new witness's testimony is not as to a particular incident. It's the overall credibility of the victim. You would agree with that, right? Oh, I would agree with that. And she gave a very detailed account of what was going on at that time period that's completely inconsistent with what these witnesses now, who at least spent a fair amount of time with the couple-I don't know if it's fair to call them a couple- but with these two individuals. And I could see how the jury, notwithstanding the fact that this guy was a drug dealer, would place more weight on what he's saying than on the word of someone who, what, interacted with them for maybe 20 minutes in a store, 15 minutes or something in a chance encounter, right? Sure. I think that's probably true. But I don't think we're here to go back and say what would have been Mr. Dowd's perfect defense. What could we have done to give Mr. Dowd the best defense that's known to any reasonable lawyer? I think what we have to do is go back and look at what Mr. Bailey did and find the two prongs. And so the issue to me that I've seen, at least with these Utah witnesses, is one, he never even heard of the women. He only heard of Miguel. I concur, obviously, with the district court that that wasn't enough information for Mr. Bailey to find them. I think we can assume, though, if he found Mr. Velazquez, he would have been able to find the other two, right? Oh, yes, absolutely. So all we're focused on is did he get enough information to find Mr. Velazquez? Yes. And it sounds like there were some details, particularly the phone number in the personal possessions, that just nobody ever followed up on. That seems like a pretty easy step to take, right? I don't think we do have any evidence to show why or I don't know if that stuff was ever looked at, yeah. But is it undisputed that they never did, in fact, go and check the personal possessions to see if they could find that phone number? I think it might be. I don't recall if I asked Mr. Bailey that specifically on his direct, but I think you are correct. I think it's a fair assumption, and I'm willing to do that, of course. Let's assume that they didn't go and check through his possessions for that phone number. He did do what Mr. Dowd had asked him to do, which is speak to the brother, though, as I mentioned. But, again, I think that it seems to me that your concern, Judge Watford, is also that if these people were to testify, I think you think that would have made a difference, or at least let's assume for the sake of argument, right, that it would have made a difference in the trial. And I don't know that it would have because of the presentation of the government's evidence. And the issue is, right, Dana Johnson's credibility. But Dana Johnson's credibility was attacked fervently throughout the entire case, even arguably in the direct case. I mean, they talk about the sister's testimony, Ellen Bonker. You know, to really believe Dana Johnson's story, you have to actually believe that she wasn't telling the truth to Ellen Bonker. What came out at the trial, as best that I could tell you, and I wasn't the trial counsel, of course, in this case, but as best as I could tell from reading the record, was that this was a very complicated relationship, and Ms. Johnson put a lot of energy into hiding the violent aspect of her relationship, lying and covering it up. And, you know, to tell you the truth, if I would have tried it, I probably would have put an expert witness to discuss that more fully in the stand, and we would have that. What about battered spouse syndrome? Something to that effect, Your Honor, about the internal fear of what is going to happen and why you lie to everyone around you and cover up your bruises, and this is a known thing. And so I think that while we can sit here now and pick apart, and maybe Mr. Bailey should have done more for Miguel, maybe he couldn't have. You know, I understand that's what we're here to decide. What we have to look at, too, is the overarching facts of the case, that Ms. Johnson was being, if we were to believe the facts as the jury found them, terrorized by this man and feared for her family's life and her life. So she continued to create a mask over herself of what behind closed door Mr. Dowd was doing. So even if we had Melissa Montes and Ms. Vasquez, who I would probably submit to the court, seem credible to me, I don't believe that would have changed the outcome. There was no prejudice that would have resulted because the jury believed that that was part of what she was doing. Part of her lie, part of her being terrorized by this man was covering up the abuse that he was doing. So even if that evidence had come out, the jury believed the government's direct case that showed that this is what Dana Johnson was doing. And I would submit to the court that the jury believed Dana Johnson herself. I don't think there's any question about that. Right. I mean, he actually was acquitted of a number of charges that I question how the jury acquitted him of those and convicted him of, I guess it was count three or whatever the main count was. Yes, Your Honor. Can I just jump, I'm sorry for taking us off track, to the Brady claim? Sure. Because the statement that the sister is now saying she would have testified to does seem much more damning than anything that it sounds like came out on her cross. And is there a dispute about what specifically she told the FBI agent? I'm thinking in particular about the allegations against the father, for example, or just Ms. Johnson's tendency to make up things to get attention and the like. Is there a dispute about the specifics of what she relayed to Agent Olson? Yes, sir. It is Agent Olson. I think there would be. Now, again, the district court, we did not depose either Mr. Olson, Agent Olson, I should say, or Ellen Bunker. And I think the district court denied that because that claim wasn't really fleshed out in the original 2255. Obviously, you can see from our briefs, Mr. Huvestal and I sort of argue that point and I leave that for you guys to decide. But we don't believe, we agree with the district court that that issue, that there was no discussion of Brady and there was no discussion of a 302 in the original 2255 claim. Well, put aside the 302. The existence or nonexistence of that seems to me irrelevant. But the district court did have Ms. Bunker's, the sister's declaration, right? Yes, sir. In which she says that, I told Agent Olson, and again, I'm just not clear on what exactly it is she may or may not have told him. But assuming that she gave him, she relayed all of the specifics that are in her declaration now to the agent, there's no question that that material should have been turned over to the defense. And it sounds like there's no dispute that it wasn't, right? Right. I would, I'm not so sure Ms. Bunker, I don't know. Again, I didn't depose her. But I don't think we can take her affidavit as utterly reliable five years after mentioning to Agent Olson. I specifically remember telling her that Dana makes up stories. But let's say that happened. Let's say that did happen. And we would have had to have turned that over. I believe, Your Honor, that would be giglio that we would have to turn over. And, of course, we would have. But let's assume that got done. Again, let's look at the prejudice prong. Where does that get us? I'm not even sure you can cross-examine Ms. Bunker on, you know, her childhood tendencies to make up stories. I'm not so sure that would be admissible. The victim's sister wouldn't, I mean, I read the cross. There was relatively little the defense lawyer could do with what he had. But if he had this other information, you don't think he could have crossed her on it? I don't mean to sound contrary at all. I really don't know. I mean, is it really fair to cross-examine someone on their sister saying when you were kids you made up stories to get attention? I don't know. I'm not trying to, again. That does raise an issue under the evidence rules as to whether or not the district court would have discretion, and I think it would, to exclude that testimony. I forget the rule. Is it 608 or something? Forgive me, Your Honor. That's okay. I think the district court has the authority to exclude collateral evidence of impeachment because it then turns the trial into a mini-trial on whether or not Ms. Johnson was abused by her father based on the testimony of the sister who's called a character assassin. But the question I have for you is, under Brady, isn't the test that we apply, that even if this impeaching material had been produced, can we conclude beyond a reasonable doubt that we can no longer have confidence in the verdict that was rendered had that evidence been introduced at the trial? Your Honor, yes. I would argue that it's. That's the test of materiality, is it not? Yes, Your Honor. Yes. I don't believe it's Brady, though. I would think this would be Giglio evidence. I guess you could. I'm going to guess Judge Watford might perceive it to be Brady. It's a witness, right. Okay. I can understand that argument. I would probably say that it was Giglio, but let's, you know. If it's Brady, that's a different issue. Of course it had to be disclosed. I would argue I don't think it ever happened, which is why it wasn't disclosed, Your Honor. This is an agent that's been around for many, many years. And, by the way, if it had actually been disclosed, it would have come out either indirect or cross. But regardless of that, I don't think it would have been – I don't think their prejudice would have resulted if that – she would have been – let's say she could have been cross-examined on it. Because you think she could not have been cross-examined on it? Well, let's say she could have been. I have to tell you. No, no. That's just my personal trial lawyer opinion. But let's say that she was cross-examined by it. I don't think that prejudice would have resulted, because to believe Dana Johnson's story anyway, you had to believe that she lied to her sister. So she did lie to her sister, because that was part of what the jury had to believe to find her guilty of that interstate domestic violence – excuse me, doubt guilty of that charge. So I don't think it really would have changed the end result, right, which is the prejudice prong that we're here to decide, in my opinion. I think you're out of time. I am, sir. Thank you very much. Thank you. Unless anybody has any further questions. Okay. Mr. Huvosof? Looks like you have a couple of minutes left. Thank you, Your Honor. And, of course, I'd go directly back to Mr. Dowd's written communications, setting aside for a moment what he testified that he told him. He, throughout these written communications, complains pretty hard that he is not able to contact Michael Bailey, his counsel. He says, and I'll point the court out to, again, tab 9, beginning at page 6, and there are several – he's talking about witnesses to call a trial. There are several others as well that he doesn't list in this list. I'm going to be wrongfully convicted of charges I didn't commit. I have called you time after time for the past two months and have received no, underscore, response. I am advising you of how urgent this is. Counsel, you're asking us to retry the credibility determination, and the district court made an express finding here that he was not believable and he had the testimony and the billing records of Mr. Bailey and Investigator Fullerton that identified all the face-to-face meetings that they had. There was testimony that was to phone conversations, jail meetings, and so on. I mean, are you asking us to overturn that credibility determination when we haven't seen the witnesses testify as Judge Malloy did? Yes, Your Honor, because it's clearly erroneous. I mean, he clearly says, I can't contact you. I've been trying time after time after time. I can't get a hold of you. I mean, you're familiar with the Ninth Circuit case law that says that an adverse credibility determination under these circumstances is virtually unassailable on appeal. I understand. But you want us to do it nonetheless. We're going to mount that. Yes, I think that at some point, when there is evidence that directly contradicts the district judge's finding of fact as it relates to credibility, I think, and this is the case, there has to be, by an appellate court, the ability to overturn that credibility determination. I hear your position. Thank you. The case that's argued is submitted. Thank you, Your Honor. Thank you both.
judges: Gleason, Tallman, Watford